UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ALAN L. GARRISON,                          )
                                           )
                     Plaintiff,            )
                                           )
             v.                            )   CASE NO. 1:05-cv-1450-DFH-TAB
                                           )
JO ANNE B. BARNHART,                       )
Commissioner of Social Security,           )
                                           )
                     Defendant.            )

ENTRY ON JUDICIAL REVIEW

Plaintiff Alan L. Garrison seeks judicial review of the Commissioner of Social Security's final decision denying him disability insurance benefits under the Social Security Act. An Administrative Law Judge ("ALJ") determined that although Mr. Garrison could no longer perform his former work as a truck driver, he was not disabled within the meaning of the Social Security Act because he retained sufficient residual functional capacity to perform light work. Mr. Garrison developed diabetes mellitus and required treatment with insulin to control it. The insulin treatment prevented him from continuing to work as a commercial truck driver. Under the stringent standard for disability under the Social Security Act, however, the inability to do his long-time job did not entitle him to benefits. Perhaps the most salient fact about this case and Mr. Garrison's ability to perform other work is that his treating physician found no work-related restrictions. R.

113.  As explained in detail below, the ALJ's decision is affirmed because it is supported by substantial evidence.

*Background*

Mr. Garrison was born in 1968; he was 37 years old when the ALJ found him ineligible for disability insurance benefits.  He graduated from high school and had vocational training in building and ground maintenance.  R. 108.  Mr. Garrison has worked his entire adult life as a truck driver.  R. 77.  He worked longest as a driver and deliveryman for Culligan Water, which involved lifting and carrying 80-pound bags of salt short distances many times each day.  R. 103.  Mr. Garrison has suffered from gout since 1995 and was diagnosed with diabetes in June 2002.  R. 156.

Mr. Garrison applied for disability insurance benefits on November 19, 2002, noting symptoms of fatigue, swelling in joints, difficulty walking, blurred vision, nausea, and headaches.  R. 75-77, 102.  He claims that because of these impairments, he became disabled within the meaning of the Social Security Act after November 11, 2002, the last day he held gainful employment.  See R. 225.

Painting a complete picture of Mr. Garrison's developing disabling conditions over time is complicated by the fact that the medical records accompanying his case file are incomplete.  Mr. Garrison reported that Dr. Livingston was his family doctor from 1995 to 1999, and that he believed these

records were in the possession of Dr. Mason, whom he was seeing regularly at the time he applied for benefits.  R. 109.  The record, however, includes only Dr. Mason's notes for the period between June 2002 and August 2003.  No medical records signed by Dr. Livingston are available, making it difficult to understand Mr. Garrison's condition prior to June 2002.[1]  The following outlines the record available to the court and the ALJ.

In 1997 Mr. Garrison was examined twice for suspected gout in the right foot after complaining of pain in the foot and big toe.  A radiology report of November 1997 stated:  "There are no radiographic findings typical of gout although gout may be present."  R. 133.  A December 1997 radiology report noted "some apparent soft tissue swelling" and "very minimal degenerative change."  R. 132.  The report concluded that it was uncertain whether the soft tissue swelling was related to arthritis or was caused by trauma to the foot.  *Id.*  Other medical records indicate that by 1999, Mr. Garrison was taking Indocin, Allopurinol, and Colchicine for gout.  R. 122.  Mr. Garrison was still taking medications for gout in 2003; he also reported undergoing foot surgery at some point.  R. 117.

In 1998 Mr. Garrison returned to Decatur County Memorial Hospital Radiology Department.  He complained of "cough and dyspnea."  R. 131.  The radiology report of March 1998 indicated:  "No evidence of active cardiopulmonary disease."  One year later, Mr. Garrison was examined again after complaining of

---

[1]In any case, Mr. Garrison's attorney certified that "all relevant evidence is up-to-date" prior to the scheduled ALJ hearing.  R. 206.

chest pain.  Although a radiology report found no change compared to a year earlier, an electrocardiogram led to a diagnosis of hypertension.  R. 130, R. 126. The following day, Mr. Garrison was at Decatur County Hospital experiencing acute chest discomfort, which he described to the examining physician as feeling like "10 horse[s] on my chest."  R. 122.  Community Hospitals Indianapolis staff administered aspirin, nitroglycerin, and intravenous heparin.  R. 123-24.  Doctors performed an emergency catheterization, and Mr. Garrison stayed overnight in the hospital.  R. 125.

In June 1999, Mr. Garrison was referred for another radiology exam after complaining of epigastric pain and heartburn.  The test revealed a "small sliding type of hiatal hernia" and other findings consistent with reflux esophagitis.  R. 129.  No evidence in the record reveals how this condition was treated or whether he was advised to limit his work activities to avoid aggravating his hernia.

On June 7, 2002, Mr. Garrison was informed that he could not be cleared for work under Department of Transportation rules because of unacceptably high blood sugar levels.  R. 156.  He then went to Decatur County Primary Care, where he was seen by Kathy Simon, FNP.  Mr. Garrison told Ms. Simon that he had been feeling fine and was unaware he had diabetes.  Ms. Simon ordered blood work, gave Mr. Garrison samples of Glucotrol XL, and instructed him to measure his blood sugar twice a day with a home monitor.  R. 156.  Mr. Garrison returned on June 11, 2002 for a scheduled follow-up appointment.  At that time, Ms. Simon

refilled Mr. Garrison's gout medications and placed him on both Glucotrol XL and Zocor due to diabetes. She counseled Mr. Garrison on the signs and symptoms of hypoglycemia and the complications of diabetes, and she advised Mr. Garrison to return in a few days for further blood monitoring and diabetic diet education. R. 155.

On June 14, 2002, Mr. Garrison returned to Decatur County Primary Care and reported that he was doing reasonably well with his medication. R. 154. Ms. Simon indicated in the record that the Department of Transportation medical clearance form should be obtained from Methodist Occupational Health and specified the information to be recorded on it. R. 154. No copy of this form appears in the record. In any case, Mr. Garrison returned to work as a truck driver, though he switched employers. R. 183.

The available medical records contain no further evidence of complaints for three months. In September 2002, however, Mr. Garrison returned to Decatur County Primary Care complaining of blurry vision, dizziness, excessive sweating, and nausea. R. 153. Dr. Stuart Mason noted that Mr. Garrison's symptoms were consistent with severe hyperglycemia, but that insulin could not be used because he worked as a truck driver.[2]   R. 153.   Dr. Mason prescribed 500 mg of

---

[2]Federal law requires that for a person to be physically qualified to drive a commercial motor vehicle, he must have "no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control." 49 C.F.R. § 391.41(b)(3).

Glucophage (metformin) twice a day and instructed Mr. Garrison to return to the clinic a week later.  R. 153.

A week later, Mr. Garrison's hyperglycemia was improving and he felt "100% better" with the new medication.  R. 151.  Nonetheless, Dr. Mason ordered a series of laboratory tests and instructed Mr. Garrison to return in four weeks to review the results.  Mr. Garrison returned to Decatur County Primary Care only two weeks later, on October 8, 2002, complaining that he felt very tired and was spitting up blood.  R. 152.  Laboratory tests performed on October 9, 2002 revealed that Mr. Garrison's blood glucose was very high (365 mg/dL); he also exhibited levels of thyroid stimulating hormone far outside the normal range.  R. 137.[3]  Dr. Mason counseled Mr. Garrison on the risks of heart attack, recommended aspirin therapy and a reduced-calorie diet, and doubled his Glucophage prescription.  R. 152.  Mr. Garrison stayed home from work the rest of that week.  R. 152.

By the time Mr. Garrison returned to review his lab results on October 18, 2002, he reported feeling much better with the increased Glucophage, and he had returned to work.  R. 150.  Based on the lab results, however, Dr. Mason added a diagnosis of hypothyroidism to Mr. Garrison's existing conditions of diabetes

---

[3] According to information provided with the blood work results, the normal range for blood glucose is 65-125 mg/dL.  R. 137.  A glucose reading of greater than 160mg/dl indicates the presence of Diabetes Mellitus.  Mr. Garrison's glucose reading was 365 mg/dL.  R. 137.  For thyroid stimulating hormone (TSH), the normal range is 0.49-4.67 ug/mL.  R. 138.  Mr. Garrison's reported TSH level was 20.40 ug/mL.  R. 138.

mellitus and coronary artery disease (CAD).  *Id.*  To treat Mr. Garrison's hypothyroidism, Dr. Mason prescribed Synthroid.   Dr. Mason advised Mr. Garrison to return to work after the weekend and scheduled a follow-up appointment for one month later.  R. 147, R. 150.

Over the next several weeks, Mr. Garrison called the doctor's office repeatedly to request medical excuses for work absences.  R. 147-150.  These requests were apparently a topic of some conflict between Mr. Garrison and Dr. Mason.  Dr. Mason wrote in his clinical notes: "I . . . stated to [Mr. Garrison] that he can't take a week at different times off and call us weeks later wanting work excuses for time off.  I also informed him he did have an appointment on October 18th and made no mention of needing work excuses."  R. 148.

When Mr. Garrison next visited Dr. Mason on November 18, 2002 for his one month follow up, he had been fired from his job.  R. 147.  At that visit he reported worsened symptoms of exhaustion, low appetite, continued dizziness, and wide fluctuations in blood sugar levels.  Dr. Mason instructed him to continue taking the Synthroid and prescribed 10 units of NPH insulin to be taken each morning.  *Id.*

At Mr. Garrison's last appointment, Dr. Mason had instructed him to return to Decatur County Primary Care in two weeks.  Instead, Mr. Garrison appeared at the Shelby Health Clinic the next day, November 19, 2002.  R. 189.  The clinical

-7-

notes indicate that Mr. Garrison was out of Glucophage and Synthroid and was shaking, sweating profusely, and feeling nauseated. Mr. Garrison's recorded blood sugar level was 470 mg/dL. R. 189. Medical staff refilled his prescriptions and performed a physical exam. R. 189. On the same day, Mr. Garrison applied for disability insurance benefits. R. 75-77.

Mr. Garrison claimed that his symptoms worsened between November 2002 and February 2003. R. 80, 82. During September and October of 2002, Mr. Garrison visited Dr. Mason's office four times. R. 150-53. After losing his job in late October, Mr. Garrison saw Dr. Mason on November 18, 2002 for a previously scheduled appointment. R. 147. Thereafter he returned to Decatur County Primary Care only to complete disability forms. R. 145, 192. Mr. Garrison then began attending the Shelby Health Clinic (a/k/a Aguilar/Sherer Primary Care Clinic). R. 188-191. The clinical notes recorded at Shelby Health Clinic are less detailed than those kept by Decatur County Primary Care, and much of the handwriting is illegible. In addition, Mr. Garrison initially failed to notify SSA that he had switched primary care providers, so these medical records were not available at the initial determination and reconsideration stages, though they were available to the ALJ.

On December 6, 2002, Mr. Garrison completed an activity questionnaire for the Disability Determination Bureau. He reported that he tired after walking two blocks or climbing 15 steps: "I'm tired all the time, feel sick, my body feels

drained, just not myself, out of breath . . . sleep all the time." R. 87. Dr. Mason performed a disability physical exam for Mr. Garrison on December 9, 2002. R. 145. The available notes from this visit are brief and state no conclusion about whether Mr. Garrison was actually disabled: "disability PE; feeling tired all the time, pt. states he's not himself. Just not feeling right." R. 145.

On January 9, 2003 Dr. Mohammed Majid, a consultant medical examiner appointed by the Disability Determination Bureau, examined Mr. Garrison. Dr. Majid noted Mr. Garrison's medical history of hypothyroidism, gout, diabetes and cardiac catheterization. R. 117-119. Dr. Majid reported that Mr. Garrison had a "normal appearance" with "mild-to-moderate obesity," possessed a normal gait, vision, joints, handgrip, and fine-finger manipulation. The report further indicated that Mr. Garrison was able to walk, mount the exam table, comb his hair, button his clothes, and manipulate a bottle cap without assistance. Dr. Majid concluded: "The claimant's subjective and objective findings does [sic] not seem to relate [sic] any significant disabling condition related to his activities of daily living. He can sit, stand, walk, carry, lift and handle objects without any difficulty." R. 119. Dr. Majid did not comment on Mr. Garrison's complaints of persistent tiredness, except to note that Mr. Garrison exhibited "no fatigue at rest." The report also stated that Mr. Garrison's symptoms were "probably related to poorly or uncontrolled diabetes mellitus." R. 119. Dr. Majid concluded: "I strongly suggest for him to see a diabetic specialist for tighter control of his blood sugar, which will improve his overall condition. Currently, his diabetes is poorly

controlled causing symptoms as listed above, which could be limiting and higher risk for his profession." R. 119.

Mr. Garrison returned to the Shelby Health Clinic on January 14, 2003.[4] R. 188. Clinical notes indicate that Mr. Garrison had run out of diabetes medication, was experiencing gout in the left elbow, and had extremely high blood sugar levels. R. 188. Medical personnel instructed him to resume Glucophage and added a prescription for Avandia; additional clinical notes are illegible. R. 188. The clinical notes do not indicate the subjective symptoms Mr. Garrison experienced that day, such as whether he felt fatigued or weak.

On February 5, 2003, the Disability Determination Bureau assigned Mr. Garrison a primary diagnosis of diabetes mellitus and a secondary diagnosis of obesity, and concluded that he was not disabled. R. 55.[5] On February 20, 2003, Mr. Garrison filed a request for reconsideration. He stated that he experienced "headaches, blurred vision, mentally, physical, nervous and weak. I'm always

_____

[4]The clinical notes of this appointment are mistakenly dated "1-14-02." The visit must have been in early 2003 because the clinical notes refer to medications that Mr. Garrison was not yet taking in January 2002. This is further confirmed by cross-reference to Mr. Garrison's February 2003 Reconsideration Disability Report, in which he reported that his gout had recently spread to his left elbow. R. 80.

[5]The Disability Reviewer assigned to Mr. Garrison's application for benefits, Sandra E. Olivas, requested medical advice in December 2002 as to whether Mr. Garrison required current cardiac testing to evaluate the severity of his impairment. R. 114. Medical Specialist Dr. F. Montoya advised that in the absence of current complaints of chest pain, the impairment should be considered not severe and did not require additional testing. R. 114.

tired, pain with gout all the time and swelling.  I feel drained, little things make me exhausted." R. 59.  Mr. Garrison stated that since his initial filing, he had become weaker and suffered nerve damage, and that his gout had spread from his feet and legs to affect his elbow as well, and that he now became tired performing simple activities like taking a shower.  R. 80-83.

Mr. Garrison returned to the Shelby Health Clinic in April 2003 to obtain a refill of his Synthroid medication and diabetes check-up.  His blood sugar levels remained elevated; treating staff doubled his Avandia dosage.  R. 191.

Mr. Garrison did not, however, advise SSA of this fact.   In his Reconsideration Disability Report filed in February 2003, Mr. Garrison reported that he was still seeing Dr. Mason regularly, and neglected to mention his recent appointments at the Shelby Health Clinic.  R. 81.  Reconsideration of Mr. Garrison's application for benefits was thus made without benefit of any medical records from the Shelby Health Clinic.  The Disability Determination Bureau (DDB) did obtain a brief statement from Dr. Mason, who they believed was still Mr. Garrison's treating physician.  In fact, Dr. Mason had not seen Mr. Garrison in more than three months.  R. 113.  In response to the DDB's inquiry, Dr. Mason certified a one-page form stating that "[Mr. Garrison] may do any of the activities listed above." R. 113.  Those activities included many work-related activities: sitting, standing, walking, bending, lifting, carrying, handling objects, hearing, speaking, and traveling, as well as mental activities needed for work.  Dr. Mason

did not submit any other statement about Mr. Garrison's conditions, prognosis, limitations, or abilities.

On reconsideration, Dr. Bernard Stevens, a member of the Chicago Regional Office Medical Consultant Staff, affirmed the previous finding that Mr. Garrison's impairments were not severe, relying on Dr. Majid's examination report and Dr. Mason's statement.  R. 112.  A second Disability Examiner, Steve Oren, reviewed the revised Disability Report, the existing medical records, Dr. Mason's additional statement, and Dr. Stevens's Case Analysis.  Mr. Oren confirmed the previous Examiner's conclusions: primary diagnosis of Diabetes Mellitus (Code 2500), secondary diagnosis of Obesity (Code 2780), claimant not disabled.  R. 53.  The attached Disability Determination Rationale explained that although the medical evidence showed that Mr. Garrison suffered from diabetes and obesity, "the diabetes appears to be treatable with proper diet and medication."  R. 54.  The Rationale did not acknowledge any medical evidence supporting Mr. Garrison's diagnosis of gout, and made no mention of Mr. Garrison's thyroid and cardiovascular conditions.  It did note: "Your treating medical personnel have not identified any significant limitations on normal physical or mental activity."  R. 54.  Accordingly, the Disability Determination Bureau denied Mr. Garrison's application for benefits on reconsideration on June 12, 2003.  R. 57-58.

On June 24, 2003, Mr. Garrison requested a hearing before an ALJ.  R. 56.  In a statement submitted with the request, Mr. Garrison reported that he was

then being treated at the Shelby Health Clinic, that he had recently been diagnosed with high blood pressure, and that his fatigue had worsened since March 2003.  R. 78.

Medical records indicate that Mr. Garrison visited Dr. Mason on July 9, 2003 for a disability physical, the first time he had been to Decatur County Primary Care in seven months.  R. 185, 192.  Dr. Mason recorded completing the form on July 13, 2003, however, no copy appears in record.  R. 192.  The record does include a single page of results from laboratory tests ordered by Dr. Mason. The laboratory results indicate that Mr. Garrison's blood glucose was marginally above normal.  R. 193.  His TSH levels were still outside the normal range, though with clear improvement.  R. 193.[6]

Although scheduled for a follow-up appointment at Decatur County Primary Care on August 8, 2003, Mr. Garrison did not attend.  R. 192.  No available records indicate that Mr. Garrison received medical care from any source for the next nine months.  The next available medical evidence dates to May 2004, nine months later.

---

[6]The reference range for blood glucose is 65-125mg/dL; a glucose reading of greater than 160mg/dL indicates diabetes mellitus.  R. 193.  Mr. Garrison's July 2003 glucose result was 365 mg/dL.  R. 137.  For thyroid stimulating hormone (TSH), the normal range is 0.49-4.67 ug/mL.  R. 138.  Mr. Garrison's July 2003 TSH result was 10.11 ug/mL.  R. 193.  In October 2002, it had been 20.40 ug/mL.  R. 138.

In May 2004, while awaiting his hearing, Mr. Garrison presented to the Shelbyville Major Hospital emergency room with a fever, weakness, sharp pains in the upper abdomen, and tenderness in the legs. R. 194. He reported vomiting six times earlier in the day. *Id.* After receiving treatment, he indicated feeling much better and was released in improving condition. R. 194-95. Testing indicated his blood sugar level was 296 mg/dL. R. 201.

From June to November 2004, Mr. Garrison had a series of physical examinations performed by nurses. The September 2004 exam indicated his blood sugar level was 274 mg/dL. The October 2004 exam revealed a blood sugar level of 396 mg/dL. In November 2004, Nurse B. Stieneker observed that Mr. Garrison's blood sugar level was better, 208 mg/dL.

Mr. Garrison and a vocational expert testified before ALJ Albert J. Velasquez on January 18, 2005. R. 223. Mr. Garrison was represented by an attorney at this hearing. He testified that he lived with his girlfriend and was assisted by his brother-in-law and sister. R. 226. He testified that he could not work because after "10 minutes of work . . . I get real hot and sweaty and clammy, and I just feel like I'm going to pass out at times." R. 228. He also testified that work was not possible because he was often forgetful. R. 229-30. At times, he felt a tingling sensation in his hands and feet that was tied to his blood sugar level. R. 231. He also testified that he took medicine for diabetes, R. 230, and when his blood sugar levels were under control his symptoms were alleviated. R. 231. Mr. Garrison

also noted that swelling and pain due to gout occasionally prevented him from walking at all.  R. 232.  He would take Allopurinol, Cotrimazine, and Indocin until the symptoms subsided.  R. 232-33.  He also testified that he suffered from high blood pressure, a hiatal hernia, and thyroid problems.  R. 234-35.

On April 25, 2005, the ALJ issued his opinion denying Mr. Garrison's application for disability insurance benefits.  R. 14-19.  Because the Appeals Council denied further review of the ALJ's decision, R. 5-7, the ALJ's decision is treated as the final decision of the Commissioner.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Mr. Garrison filed a timely petition for judicial review.  The court has jurisdiction in the matter under 42 U.S.C. § 405(g).

*The Statutory Framework for Determining Disability*

To be eligible for disability insurance benefits, a claimant must establish that he suffers from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d).  Mr. Garrison was disabled only if his impairments were of such severity that he was unable to perform work that he had previously done and if, based on his age, education, and work experience, he also could not engage in

-15-

any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to him.  *Id.*

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  This case illustrates one major difference between the Social Security Act and most private disability insurance policies. Mr. Garrison's diabetes treatment with insulin prevents him from doing his work as a truck driver.  But under the Social Security Act, he must be disabled from doing virtually any kind of substantial work before he is entitled to benefits.  As this case can illustrate, even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  The steps are:

(1)    Has the claimant engaged in substantial gainful activity?  If so, he was not disabled.

(2)    If not, did the claimant have an impairment or combination of impairments that are severe?  If not, he was not disabled.

(3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)    If not, could the claimant do his past relevant work? If so, he was not disabled.

> (5)    If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then he was not disabled.  If not, he was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Applying the five-step process, the ALJ found that Mr. Garrison satisfied step one because he had not engaged in substantial gainful activity since his alleged onset date of disability.  At step two, the ALJ found that he suffered the severe impairment of gout.  At step three, the ALJ found that he failed to demonstrate that this severe impairment met or equaled any listed impairment.  At step four, the ALJ found that he was not able to perform any of his past relevant work.  The ALJ then considered Mr. Garrison's residual functional capacity at step five.  He found that, despite his severe impairment, he retained the residual functional capacity to "perform a full range of light work." R. 18.  The ALJ concluded that Mr. Garrison was not disabled because he could perform a significant number of jobs in the state of Indiana.  *Id.*  This finding was based on the ALJ's rejection of Mr. Garrison's claim of several non-exertional limits on his ability to work.

*Standard of Review*

"The standard of review in disability cases limits . . . the district court to determining whether the final decision of the [Commissioner] is both supported by substantial evidence and based on the proper legal criteria." *Briscoe*, 425 F.3d at 351, quoting *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court must "'conduct a critical review of the evidence,' considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision . . . ." *Briscoe*, 425 F.3d at 351, quoting *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); see also *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The court must not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based his decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305,

309 (7th Cir. 1996). This determination by the court requires that the ALJ's decision adequately discuss the relevant issues: "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351, citing *Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir. 1994). Although the ALJ need not provide a complete written evaluation of every piece of testimony and evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005), a remand may be required if the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

*Discussion*

I.   *ALJ's Evaluation of Claimant's Diabetes*

A.   *ALJ's Failure to Cite Listing 9.08(A)*

At step three, the ALJ explained that he had evaluated the most serious impairment, gout, under the revised musculoskeletal listings. Mr. Garrison does not challenge that finding, but argues that the ALJ erred at step three by failing to analyze explicitly his diabetic condition using Listing 9.08(A). That listing calls for an automatic finding of disability in a case of diabetes mellitus with neuropathy "demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. . . ." It is apparent from the decision,

however, that Mr. Garrison's diabetic condition was not severe enough to require step three analysis by the ALJ.  The ALJ considered the evidence of diabetes mellitus and concluded:

> The evidence also reports treatment for diabetes mellitus and hypothyroidism, but they both appear to be under control and there is no indication how these conditions would impact the claimant's ability to work.

R. 18.  The ALJ also noted that Dr. Mason, who was treating Mr. Garrison's diabetes during much of the relevant time, from August 2002 through December 2002, concluded that Mr. Garrison could sit, stand, walk, bend, lift, carry, handle objects, hear, speak, and travel without limitation.  R. 17, citing R. 113.  If Mr. Garrison's diabetes was under control and did not affect his ability to work activities, then it was not "severe" for purposes of step two.  See *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) ("An impairment is severe if it significantly limits your physical or mental ability to do basic work activities, and thus an impairment is not severe if it does not significantly limit your physical or mental ability to do basic work activities.") (internal quotations omitted).  Given the evidence that Mr. Garrison's diabetes could be controlled and the evidence from Dr. Mason, the ALJ had no reason to go further with respect to Listing 9.08(A).

B.    *ALJ's Evaluation of Evidence Regarding Claimant's Diabetes*

Though plaintiff mischaracterizes the nature of the ALJ's decision regarding his diabetic condition, his remaining arguments are still applicable to the ALJ's treatment of diabetes-related evidence.  Mr. Garrison contends that the ALJ

systematically and selectively ignored evidence that his diabetes was not under control and was sufficiently severe to be disabling.[7]  He lists items of evidence that the ALJ did not specifically mention in his decision, including several instances in which Mr. Garrison exhibited elevated blood sugar levels and symptoms of diabetes.

In reaching a decision, the ALJ must identify supporting evidence in the record and adequately discuss the issues.  *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).  In doing so, the ALJ is not required to mention every piece of evidence in the record.  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  Rather the ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability."  *Id.*, citing *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988).

The ALJ did not mention every occasion where Mr. Garrison was found to have elevated blood sugar levels or exhibited some other sign of diabetes.  However, the ALJ did extensively consider evidence indicating the extent of Mr.

---

[7]Mr. Garrison makes essentially the same argument in three different ways. First, he contends the "ALJ ignored medical evidence relevant to the requirements of Listing 9.08A which was contrary to his denial decision." Pl. Br. 14.  Second, he accuses the ALJ of "selectively considering evidence but ignoring the portions of reports which supported a finding of disability." Pl. Br. 18.  His final variant of this argument is that the "ALJ ignored and only selectively considered, without explanation, the evidence proving Garrision's diabetes and other impairments met or equaled the requirements of Listing 9.08A, and rejected without explanation, the portions of treatment evidence proving Garrison was totally disabled." Pl. Br. 20. As the applicable legal standards are identical, the court considers these arguments together.

Garrison's diabetic condition. The ALJ recognized that Mr. Garrison was diabetic. R. 16. At several points in his decision, the ALJ noted Mr. Garrison's elevated blood sugar levels, but also recognized that his diabetic symptoms showed improvement and could be controlled by working with specialists. R. 17. He observed that on June 7, 2002, Mr. Garrison "was seen to have high blood sugar[] [levels] checked out." R. 16. The diagnosis was diabetes, and he was put on Glucotrol. *Id.* During a follow-up visit he reported "doing well with medications and had had no problems." *Id.*, citing R. 155. In October 2004, the ALJ noted, Mr. Garrison's blood sugar level was 396, but a month later, after receiving a testing machine and a meal-planning guide, his blood sugar was down to 205 in November 2004. R. 17. Mr. Garrison testified that he experienced some tingling in the hands and feet when his blood sugar level was not stable, but his January 2003 physical exam indicated that his motor functions were grossly intact, fine-finger manipulation was within normal limits, and knees, ankles, and feet were normal. R. 17, 119. In considering the opinion of medical experts, the ALJ noted:

> The [state] examiner stated both subjective and objective findings did not suggest any significant disabling condition and his own family doctor remarked that the claimant was not limited for any work related activities. The State Agency examiners found the claimant had no severe impairment.

R. 17.  Rather, based on this substantial evidence, the ALJ reasonably concluded

that Mr. Garrison's controllable diabetes did not represent a disabling condition.[8]

C.      *ALJ's Failure to Provide a Medical Advisor at the Hearing*

Mr. Garrison next argues that the ALJ erred by failing to have a medical

advisor testify at the hearing about whether he met or equaled the requirements

for a listing.  Testimony from a medical advisor was not required.  State agency

physicians consider the listings prior to completing a disability determination and

should indicate on the transmittal forms if any listing is met or equaled.  See SSR

96-6p.  These forms represent the state agency physicians' opinions regarding

medical equivalence and their assessment of plaintiff's functional abilities and

were a part of the record considered by the ALJ.  An ALJ is required to obtain an

updated opinion on medical equivalence only when there is additional medical

evidence that the ALJ believes might "change the state agency medical or

psychological consultant's finding" or that the "symptoms, signs and laboratory

findings reported in the case record suggest that a judgment of equivalence may

be reasonable."  SSR 96-6p.

---

[8]Mr. Garrison objects to the ALJ premising the denial of benefits on the fact that his continued problems with diabetes was – as plaintiff phrases it – "self-inflicted."  Pl. Reply Br. at 4.  The Seventh Circuit has made clear that if a condition is remediable, then there is no basis for an award of benefits.  *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004).  Plaintiff does not claim that his diabetic symptoms are non-remediable.

State physician Dr. Mohammed Majid examined Mr. Garrison in January 2003 and reported that he had no significant disabling conditions.  R. 119.  He noted that Mr. Garrison could "sit, stand, walk, carry, lift and handle objects without any difficulty."  *Id.*  Dr. Majid did observe that Mr. Garrison suffered from diabetes and felt it necessary to "strongly suggest for him to see a diabetic specialist for tighter control of his blood sugar, which will improve his overall condition."  *Id.*  On reconsideration, Dr. Bernard Stevens reviewed the medical records, agreed that Mr. Garrison did not suffer from any severe impairments, and noted that Mr. Garrison's own treating physician had found no work-related limitations.  R. 112.  Although the ALJ found the severe impairment of gout, this medical evidence provides ample support for the ALJ's findings.  Mr. Garrison has not come forward with additional medical evidence that would alter these earlier findings.  This challenge to the ALJ's decision fails.

II.    *ALJ's Credibility Determination*

Finally Mr. Garrison questions the ALJ's credibility determination.  Plaintiff testified before the ALJ that his blood sugar level kept "going up and down" and that work caused him to become hot, sweaty, and clammy.  R. 228.  According to Mr. Garrison, work was physically impossible because he felt drained and miserable.  R. 230.  The ALJ acknowledged that his allegations of pain and weakness – if true – would mean that he was precluded from all work activity.  R. 16.  However the ALJ ultimately concluded this testimony was not consistent with the evidence on the record.  *Id.*

Because hearing officers have the unique opportunity to evaluate a witness's forthrightness, courts generally afford such officers' credibility determinations substantial deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  A reviewing court will not set aside an ALJ's credibility finding unless it is "patently wrong."  *Id.*; *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986).  However, where a credibility determination is based on "objective factors or fundamental implausibilities," a reviewing court has greater freedom to review the ALJ's decision.  *Herron*, 19 F.3d at 335; see also *Briscoe,* 425 F.3d at 354.

The ALJ supported sufficiently his determination that Mr. Garrison's testimony at the hearing was not fully credible.  First, the ALJ noted that objective medical evidence did not support the degree of limitation claimed by Mr. Garrison.  Consistent with Social Security Ruling 96-7p, the ALJ did not stop there but went on to consider other factors in assessing the claimant's credibility.  He recognized that Mr. Garrison engaged in very little daily activity.  R. 17-18.  However, given the evidence on the record, the ALJ concluded that this sedentary lifestyle was self-imposed, to some degree.  R. 18.  The ALJ discussed factors that aggravated Mr. Garrison's diabetic symptoms, such as eating "two hamburgers and cottage cheese."  R. 17.  After Mr. Garrison was given a meal-planning guide (an example of a non-medicinal treatment), his blood sugar level was lower at the next check-up.  *Id.*  The ALJ also found it significant that Mr. Garrison reported experiencing back and joint pain during the hearing, R. 240-41, but had made no mention of this pain to the consultative examiner.  R. 17.  The ALJ's credibility determination

is both supported by substantial evidence and sufficiently detailed to enable judicial review.  This challenge therefore fails.

*Conclusion*

The ALJ in this case found that Mr. Garrison did not establish disability under the law.  Because the ALJ's decision was consistent with the law and supported by substantial evidence, the court affirms the Commissioner's decision. The court will enter final judgment accordingly.


So ordered.

Date: February 20, 2007

_David F Hamilton_

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
mulvany@onet.net